IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| B.M., individually and on behalf of C.M.,<br><br>    Plaintiff,<br><br>v.<br><br>ANTHEM BLUE CROSS and BLUE SHIELD,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR EXCLUSION<br><br>Case No. 1:22-cv-00098-JNP-JCB<br><br>Chief District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

Plaintiff B.M. challenges Defendant Anthem Blue Cross and Blue Shield's ("Anthem") determination that his daughter C.M.'s residential treatment was not a covered benefit under B.M.'s health benefit plan (the "Plan"). ECF No. 2 ("Compl."). Both B.M. and Anthem move for summary judgment on B.M.'s sole remaining claim. ECF No. 83-1 ("Pl.'s Summ. J. Mot.")[1]; ECF No. 89 ("Def.'s Summ. J. Mot.")[2]. For the reasons below, B.M.'s motion is GRANTED and Anthem's motion is DENIED. Additionally, Anthem moves to exclude some of B.M.'s expert's

---

[1] ECF No. 82 (publicly available). When the court cites to a document that has been filed under seal, it will provide the corresponding publicly available document when one has been filed.

[2] ECF No. 87 (publicly available).

opinions under Federal Rule of Evidence 702. ECF No. 86 ("Def.'s Rule 702 Mot."),[3] which is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Both B.M. and C.M. reside in St. Louis County, Missouri. ECF No. 83-3 ("Pl.'s Rs. 1") at 301.[4] The Plan at issue in this case is a fully insured employee benefit plan that is administered by Anthem and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (codified as amended 29 U.S.C. § 1001 *et seq.*). *See* ECF No. 89-2 at 4–5 ("Def.'s Ex. 2").[5]

C.M. was born in 2006 and had mental health issues related to "depression, anxiety, anger, mood swings, suicidal thoughts and attempts, and, self-harm, all beginning in the 5th grade." Pl.'s Rs. 1 at 320, 776. She underwent various forms of therapy, including occupational, cognitive behavior, and dialectical behavior. *Id.* at 320. But even when she "was receiving the highest level of care outside of a residential setting," she continued "to struggle with distress tolerance, mood regulation, impulsivity, ADHD, OCD, and ODD." *Id.* In 2018, C.M. "began self-harm through cutting herself" and "started having suicidal ideations." *Id.* In 2020, she "was threatening suicide and had a plan to carry it out, severely cutting herself, running away on multiple occasions, and was completely dysregulated both emotionally and physically." *Id.* In May 2020, C.M. locked herself in a bathroom with medication and threatened to overdose, only opening the door after she was confronted by police. *Id.* at 320, 715. In the wake of this incident, C.M. was admitted to Aspiro Wilderness Therapy, where she continued to have major problems and was eventually removed

---

[3] ECF No. 84 (publicly available).

[4] The court's citations to the parties' exhibits follow the included Bates Numbering.

[5] ECF No. 87-2 (publicly available).

from the program. *Id.* at 320–21. C.M. then underwent short-term stabilization at ViewPoint RTC. *Id.* at 321, 890–1327.

In August 2020, C.M. was admitted to Uinta Academy ("Uinta"), a licensed residential treatment center ("RTC") that provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and substance use problems. *Id.* at 304, 316, 766, 1779. C.M.'s treatment at Uinta was initially covered by another insurer, but Anthem became responsible on February 1, 2021. *Id.* at 304; ECF No. 89-17 ("Def.'s Ex. 16"). In a letter dated February 3, 2021, Anthem denied payment for C.M.'s treatment at Uinta on the following grounds:

> The request tells us you went to a residential treatment center for your mental health condition. The program asked to extend your stay. The plan clinical criteria considers ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. *The information we have does not show you are a danger to yourself or others, or that you are having serious problems functioning to the degree that treatment at this level of care is medically necessary. For this reason, the request is denied as not medically necessary.* There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B 902 RES).

Pl.'s Rs. 1 at 134–35 (emphasis added). B.M. appealed the decision, but Anthem upheld the denial of payment in a letter dated May 20, 2021. *Id.* at 144–45, 304–67. It based its decision on the "MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B 902

RES)" (the "MCG RTC Guideline"), concluding that C.M. "w[as] not at risk for serious harm without 24-hour care" and thus was ineligible for an RTC like Uinta. *Id.* at 144–45.

B.M. commenced suit against Anthem and brought two claims: (1) a claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) based on allegations that Anthem was responsible for paying for C.M.'s treatment at Uinta based on the terms of the Plan; (2) a claim for equitable remedies under 29 U.S.C. § 1132(a)(3) based on allegations that Anthem violated the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act" or "MHPAEA"), Pub. L. No. 110-343, 122 Stat. 3881. Compl. ¶¶ 46–75. The court dismissed B.M.'s benefits claim because it was barred by a one-year statute of limitations period contained in the Plan. ECF No. 41 ("Mem. Decision & Order Granting Def.'s Partial Mot. to Dismiss"). B.M.'s only remaining claim, brought under the Parity Act, alleges that the medical necessity criteria Anthem used to deny the benefit request is "more stringent or restrictive than the medical necessity criteria that the Plan applies to analogous . . . levels of medical or surgical benefits." Compl. ¶ 57. In alleging disparate treatment, B.M. points to the less restrictive medical necessity criteria Anthem applies for admission to skilled nursing facilities ("SNFs") and inpatient rehabilitation facilities ("IRFs"). *Id.* ¶ 71.

Both parties move for summary judgment. Pl.'s Summ. J. Mot.; Def.'s Summ. J. Mot. However, B.M. does not move for summary judgment with respect to his requested relief and instead "requests the opportunity for further briefing to determine the appropriate remedy." Def.'s Summ. J. Mot. at 66. The cross-summary judgment motions implicate Anthem's request to exclude expert opinions under Rule 702, which the court also addresses. Def.'s Rule 702 Mot.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." FED. R. CIV. P. 56(a). But when "the parties in an ERISA case both move[] for summary judgment and stipulate[] that no trial is necessary, summary judgment is merely a vehicle for deciding the case" and "the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation modified). To the extent that B.M.'s claim challenges whether Anthem's interpretation of the Plan accurately reflected the Plan's terms, Anthem's interpretation is entitled to some deference and is evaluated under "an arbitrary and capricious review." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999). However, "the court affords [Anthem] no deference in interpreting the Parity Act because the interpretation of a statute is a legal question." *Christine S. v. Blue Cross Blue Shield of New Mexico*, No. 218CV00874JNPDBP, 2021 WL 4805136, at *4 (D. Utah Oct. 14, 2021); *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016).

Federal Rule of Evidence 702, in turn, requires the court to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); FED. R. EVID. 702 (requiring that the party offering expert testimony prove "that it is more likely than not that" the expert's opinion satisfy various reliability requirements and "will help the trier of fact to understand the evidence or to determine a fact in issue."). The court must bear in mind that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one" and must be based on "the particular facts and circumstances of the particular case." *Daubert*, 509 U.S. at 594; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999); *United States v. Medina-Copete*, 757 F.3d 1092, 1103 (10th Cir. 2014).

5

**DISCUSSION**

**I.    Standing**

The court first must address Anthem's contentions that B.M. has failed to establish Article III standing, which implicates the court's "independent obligation to ensure it has subject matter jurisdiction at every stage of the litigation." *Fancher v. Barrientos*, 723 F.3d 1191, 1198 n.2 (10th Cir. 2013). As the party invoking federal jurisdiction, B.M. must establish standing by showing that he "(1) suffered an injury in fact that was (2) traceable to [d]efendants and (3) redressable by a favorable decision." *M.S. v. Premera Blue Cross*, 118 F.4th 1248, 1261 (10th Cir. 2024). These "element[s] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

B.M. clearly establishes an injury in fact in the form of the denial of benefits. *See M.S.*, 118 F.4th at 1262 ("We agree the denial of healthcare benefits is a 'concrete and particularized injury' for purposes of establishing Article III standing.") (quoting *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1160 (10th Cir. 2023)). But Anthem argues that B.M. cannot show that this denial is traceable to its alleged Parity Act violation because B.M. does not prove that Anthem would have granted the benefits if not for its use of the MCG RTC Guideline. ECF No. 105 ("Def.'s Summ. J. Opp'n") at 42–45. In making this argument, Anthem emphasizes that B.M. has neither "offered any expert to testify as to the standard of care that he believes Anthem's physician reviewers should have applied under the Plan's definition of medical necessity" nor "offer[ed] any expert opinion applying the Plan's definition of medical necessity to C.M.'s clinical status." *Id.* at 45. In response, B.M. argues that the evidence establishes that the requested treatment was medically necessary under the Plan based on "the qualification of C.M.'s treating professionals, the medical experts

who submitted letters of medical necessity, [and] the substance of the medical records themselves."[6] ECF No. 112 ("Pl.'s Summ. J. Reply") at 19–20.

To be sure, these letters of necessity do not explicitly discuss the Plan's definition of medical necessity, but they repeatedly affirm that C.M.'s treatment at Uinta "was an absolute necessity" and "a medically necessary treatment course" that should be covered by any insurer. Pl.'s Rs. 1 at 765–71. Even after B.M. submitted these letters with his appeal to Anthem, Anthem failed to engage with their substance, notwithstanding Anthem's extensive obligations to conduct "a full and fair review" under ERISA. *Anne A. v. United Healthcare Ins. Co.*, No. 220CV00814JNPDAO, 2024 WL 1307168, at *6 (D. Utah Mar. 26, 2024) (citation modified); Pl.'s Rs. 1 at 321–27. Instead, Anthem denied B.M.'s appeal on the *sole* basis that C.M. "w[as] not at risk for serious harm" under the MCG RTC Guideline and did not even attempt to articulate an alternative basis for denial. Pl.'s Rs. 1 at 144–45.

Anthem's decision to rest entirely on the MCG RTC Guideline as its sole basis for denying B.M.'s appeal—even in the face of credible arguments that C.M.'s treatment was medically necessary and that its use of the MCG RTC Guideline was illegal—supports a finding that Anthem's use of the MCG RTC Guideline was a but-for cause of its decision to deny the requested benefits. *See* Pl.'s Rs. 1 at 316–19 (raising extensive and plausible arguments that the use of the

---

[6] B.M. also argues that traceability is established because it would be "inappropriate" under ERISA for Anthem to rely on additional reasons not given in its denial of benefits in subsequent remands or proceedings. *See* Pl.'s Summ. J. Mot. at 56 n.258. But even if ERISA limits the new justifications that Anthem can invoke, ERISA cannot relieve the court of its independent obligation to ensure that the Article III predicates for its jurisdiction are satisfied. *See Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."). Thus, regardless of what limitations on alternative justifications ERISA creates with respect to future proceedings and non-jurisdictional defenses, B.M. must independently establish a causal relationship between his injury-in-fact and the alleged legal violation.

MCG RTC Guideline violated the Parity Act). This showing, while by no means airtight, constitutes sufficient evidence of causation to satisfy B.M.'s burden to establish traceability. *See Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1242 (10th Cir. 2021) ("Although 'Article III does at least require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact,' it 'demands something less than the concept of proximate cause' found in tort law.") (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005)).

Indeed, the cases cited by Anthem that involve a failure to establish traceability involve much more attenuated connections between the alleged Parity Act violation and the denial of benefits. *See M.S.* 118 F.4th at 1262–63 (holding that there was no traceability because it was unchallenged that benefits still would have been denied "if [d]efendants had not violated the Parity Act"); *Jonathan Z. v. Oxford Health Plans*, No. 218CV00383JNPJCB, 2022 WL 3227909, at *2 (D. Utah Aug. 9, 2022) (holding that plaintiffs had failed to establish standing to bring a Parity Act claim because the evidence established that the challenged portions of the plan "did not control [the defendant's] decision to deny benefits"). Anthem does not cite a single case where a Parity Act claim was denied on traceability grounds when the alleged Parity Act violation was the defendant's sole basis for denying benefits. *See* Def.'s Summ. J. Opp'n at 42–45.

Therefore, the court concludes that B.M. has adequately established Article III standing and proceeds to analyze the merits of the parties' motions.

## II.     Rule 702 Motion

Before addressing the cross-summary judgment motions, the court considers Anthem's motion to "exclude certain opinions of [B.M.]'s expert, Jeffrey A. Kovnick, MD" under Rule 702. Def.'s Rule 702 Mot. at 1. Specifically, Anthem moves to exclude the following opinions: (1) "the

standards and criteria Anthem used to determine the medical necessity of residential treatment violated generally accepted standards of care"; (2) "Anthem's medical-necessity standards for RTCs, including the MCG [RTC] Guideline[], constitute acute hospitalization criteria that are inappropriate to evaluate RTC admission"; and (3)" a comparison between MCG [c]riteria for RTC on the one hand and SNF/IRF on the other shows that Anthem uses acute criteria for admission to psychiatric RTCs but does not permit the use of acute criteria for admission to SNF/IRF." *Id.* at 6, 8, 10 (citation modified); ECF No. 86-4[7] ("Kovnick Report"). The court considers these opinions in turn, each of which implicates unique arguments.

> A.    Generally Accepted Standards of Care

Anthem first moves to exclude Kovnick's opinion "that the standards and criteria Anthem used to determine the medical necessity of residential treatment 'violated generally accepted standards of care' because [the] standards [used by Anthem] are 'flexible' and subject to interpretation, and because they are standards 'appropriately applied to inpatient acute care.'" Def.'s Rule 702 Mot. at 6 (quoting Kovnick Report at 6–7). Anthem argues that this opinion is irrelevant to B.M.'s claim, and thus unhelpful to the trier of fact, because the Parity Act—as its name suggests—requires only parity between medical and surgical benefits and mental health benefits and does not demand compliance with generally accepted standards of care. *Id.* at 6–7.

In response, B.M. argues that the Plan itself requires Anthem to use criteria that reflect the generally accepted standard of care and contends that "Anthem cannot avoid liability under the Parity Act if it can do so only by admitting it violated the terms of the Plan." ECF No. 107 ("Pl.'s Rule 702 Opp'n") at 4–5. But B.M. does not provide a legal basis for this contention. On the

---

[7] ECF No. 84-4 (publicly available).

contrary, there is no reason to conclude that an admission that Anthem violated the terms of the Plan necessarily establishes a violation of the Parity Act. *See E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1283 (10th Cir. 2023).

However, compliance with generally accepted standards of care is still relevant to B.M.'s Parity Act claim to the extent that it informs whether the "limitations on benefits for mental health . . . treatment . . . are 'more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan.'" *Id.* at 1284 (quoting 29 U.S.C. § 1185a(a)(3)(A)(ii)). While the bare fact that Anthem applied requirements inconsistent with generally accepted standards of care to mental health benefits does not necessarily entail a Parity Act Violation, it still can be probative of whether there was a cognizable disparity if the analogous medical and surgical requirements were consistent with generally accepted standards. *See* ECF No. 83-5 ("Pl.'s Rs. 3.") at 2516–17 (evidence supporting this assumption with respect to the medical and surgical analogs in this case). And, more broadly, generally accepted standards of care may inform the factfinder's analysis of whether a difference in treatment limitations is merely "slight" or instead is a "material" disparity that is cognizable under the Parity Act. *M.Z. v. Blue Cross Blue Shield of Illinois*, No. 1:20-CV-00184-RJS-CMR, 2023 WL 2634240, at *21 (D. Utah Mar. 24, 2023) (citation modified); *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-CV-38, 2021 WL 2532905, at *19 (D. Utah June 21, 2021).

Therefore, the court denies Anthem's request to exclude Kovnick's opinions about generally accepted standards of care. Even if not determinative, these opinions are still probative of whether Anthem engaged in illegal disparate treatment.

10

B.       Acute Inpatient Requirements

Anthem next moves to exclude "Kovnick's opinion that Anthem's medical-necessity standards for RTCs, including the MCG R[TC] Guideline[], constitute 'acute hospitalization' criteria that are inappropriate to evaluate RTC admission" on the grounds that the opinion is unreliable. Def.'s Rule 702 Mot. at 8 (quoting Kovnick Report at 7). Here, Anthem argues that there is an inconsistency between (1) Kovnick's opinion that the standards Anthem used, which required symptoms such as danger to self or other, would be interpreted by most examiners as a "standard most appropriately applied to inpatient acute care" and (2) his deposition testimony where he acknowledged that individuals with the symptoms identified in the MCG RTC Guideline and Anthem's denial letter may be appropriately treated at lower levels of care depending on other relevant factors. *Id.* at 8–10; Kovnick Report at 7; ECF No. 86-5[8] ("Kovnick Dep.") at 160–62.

The argument is specious. Anthem assumes that Kovnick's current opinion is that the "symptoms [listed in the MCG RTC Guideline and used by Anthem as a requirement for RTC admission] *categorically* require inpatient hospitalization," but his report contains no such pronouncement. ECF No. 110 ("Def.'s Rule 702 Reply") at 8 (emphasis in original); Kovnick Report. Instead, Kovnick opined as follows:

> Anthem's denial of coverage for CM was based on "psychiatric guidelines" that require a determination of either "danger to self," "danger to others," or "serious dysfunction in daily living" in order to qualify for coverage. The reviewer that denied CM's coverage provided examples of symptoms that she did not exhibit, such as command auditory hallucinations, psychosis, suicidality, and "not sleeping and eating." Anthem contended that CM's symptoms were not acute enough to meet the RTC level of care. And yet, all of the examples the Anthem reviewers gave when denying CM's stay are commonly used criteria for inpatient admission to an acute psychiatric hospital. *To put it another way, without further definition*

---

[8] ECF No. 84-5 (publicly available).

> *or explication within the guidelines, most psychiatrists would consider these as guidelines for an acute level of care.*

Kovnick Report at 5–6 (emphasis added). Kovnick thus merely opined that Anthem's practice of requiring the symptoms listed in the MCG RTC Guideline is "more appropriate" for acute inpatient care and thus is an inappropriate requirement for lower levels of care. *Id.* at 7. He in no way suggests that the presence of one of the symptoms in the MCG RTC Guideline automatically renders acute inpatient care appropriate. Thus, there are two relevant opinions expressed by Kovnick that are easily reconcilable: (1) his opinion that requiring the presence of the symptoms listed in the MCG RTC Guideline as *necessary* for treatment is only appropriate for acute inpatient care; and (2) his opinion expressed in deposition testimony that the presence of the symptoms is not always *sufficient* for rendering acute inpatient care appropriate, depending on the specific patient's support system and other personal details. Kovnick Dep. at 160–63, 165–67.

Seeing no inconsistency, the court denies Anthem's request to exclude Kovnick's opinion that the MCG RTC Guideline's medical necessity criteria are inappropriate for RTC admission.

C.    Skilled Nursing and Inpatient Rehabilitation Facilities

Finally, Anthem moves to exclude Kovnick's opinion that the MCG criteria for skilled nursing and inpatient rehabilitation facilities exclude patients with acute symptoms on the grounds that it is unreliable. Def.'s Rule 702 Mot. at 10. B.M. "does not contest" the exclusion of this opinion and acknowledges that the skilled nursing and inpatient rehabilitation guidelines are outside the scope of his expertise. Pl.'s Rule 702 Opp'n at 8. Therefore, the court grants Anthem's request for exclusion with respect to Kovnick's opinions regarding the MCG criteria for skilled nursing and inpatient rehabilitation facilities.

### III.   Summary Judgment Motions

Now, the court turns to the parties' summary judgment motions. B.M.'s remaining claim requests "appropriate equitable relief . . . to redress . . . violations" of the Parity Act under § 1132(a)(3).[9] 29 U.S.C. § 1132(a)(3); Compl. ¶ 74. The court first determines whether Anthem violated the Parity Act. Because this is an issue on which both parties move for summary judgment, the court simply determines the issue itself, without a thumb on the scale in favor of either party. After identifying a Parity Act violation, the court next considers whether appropriate equitable relief is available under § 1132(a)(3). On this issue, only Anthem moves for summary judgment, with B.M. not addressing the availability of remedies in his motion and instead reserving the issue for future briefing. *See* Pl.'s Summ. J. Mot. at 66.[10] Thus, the court must determine whether Anthem is entitled to judgment as a matter of law based on the unavailability of remedies. Here, the court applies the normal summary judgment standard, with B.M. entitled to inferences in his favor as the non-moving party.

### A.   Violation of the Parity Act

"The Parity Act was designed to end discrimination in the provision of coverage for mental health and substance use disorders as compared to medical and surgical conditions in employer-sponsored group health plans and health insurance coverage offered in connection with group

---

[9] In connection to these motions, Anthem's counsel objected to evidence submitted by B.M. on the grounds that B.M. would be unable "to put . . . the substance or content of the evidence into an admissible form." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), *as amended on reh'g* (Nov. 8, 2016) (citation modified); Pl.'s R. 3 at 2492–95 (the challenged evidence). The court need not resolve this objection because it finds that Anthem's summary judgment motion should be denied and B.M.'s should be granted even if B.M.'s challenged evidence is disregarded.

[10] Because "show[ing] that equitable relief can be granted" is "an element of [B.M.'s] claim" and is not addressed by his motion, the court construes the motion as a request for partial summary judgment under Federal Rule of Civil Procedure 56(a). *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1223 (10th Cir. 2019).

13

health plans." *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1259 (D. Utah 2016) (citation modified). To establish a Parity Act violation, the plaintiff must (1) show that "the relevant group health plan is subject to MHPAEA"; (2) "identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan"; and (3) "identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits"; and (4) identify "a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog." *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1283 (10th Cir. 2023) (citation modified).

In this case, three of the requirements under *E.W. v. Health Net Life Insurance Company* are undisputed. There is no question that the Plan is subject to the Parity Act. C.M. identifies the restrictions contained in the MCG RTC Guideline as a treatment limitation on mental health benefits covered by the Plan. And C.M. identifies medical and surgical care that is analogous to the sought after care in the form of skilled nursing facilities and inpatient rehabilitation facilities. *See* ECF No. 83-4 ("Pl.'s Rs. 2") at 1899 (Anthem admitting "that skilled nursing facilities and inpatient rehabilitation facilities are analogous to residential treatment centers for purposes of a parity analysis"). *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1287 (10th Cir. 2023) *(*"We agree with Plaintiffs that inpatient skilled nursing facilities qualify as a relevant analog.").

The only remaining question is whether the limitations on mental health benefits that Anthem imposes through the MCG RTC Guideline are more restrictive than the limitations Anthem imposes on analogous benefits for skilled nursing facilities and inpatient rehabilitation facilities. In resolving this question, the court divides its analysis into two parts: first, it addresses Anthem's contention that there can be no cognizable disparity because the treatment limitations

14

were developed through comparable processes; second, it analyzes whether there is an impermissible disparity based on the substance of the treatment limitations.

### 1) Anthem's Proposed Safe Harbor

Anthem first argues that there can be no cognizable disparity "because the MCG criteria for all behavioral health and medical/surgical levels of care are developed, adopted, and applied to particular benefits by Anthem *using the same process*." Def.'s Summ. J. Mot. at 15 (emphasis added). In support of this proposed theory, Anthem principally relies on the following regulation:

> A group health plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, *any processes, strategies, evidentiary standards, or other factors used in applying the non-quantitative treatment limitation* to mental health or substance use disorder benefits in the classification *are comparable to, and are applied no more stringently* than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.

29 C.F.R. § 2590.712(c)(4)(i) (2014)[11] (emphasis added); Def.'s Summ. J. Mot. at 15. On this theory, Anthem has free reign to apply whatever treatment limitations it likes—even if the substance of the limitations create egregious disparities that have no basis in legitimate medical considerations—so long as the limitations derive from "comparable processes for developing medical necessity criteria." Def.'s Summ. J. Mot. at 16.

But there are reasons to be skeptical of Anthem's interpretation that the Parity Act includes this safe harbor for disparate treatment. The very regulation cited by Anthem declares that any "standard[] . . . used in applying the nonquantitative treatment limitation to mental health or

---

[11] The court cites the Parity Act regulations that were in effect during the dates of service at issue in the case.

substance use disorder benefits" must be "*comparable* to" the "standard[] . . . used in applying the limitation with respect to medical/surgical benefits." 29 C.F.R. § 2590.712(c)(4)(i) (emphasis added). And the Parity Act itself requires that "the treatment limitations applicable to . . . mental health or substance use disorder benefits [must be] *no more restrictive* than the predominant treatment limitations applied to . . . medical and surgical benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii) (emphasis added). If the statute and the regulation mean what they say, any standard that Anthem uses to limit mental health benefits must be comparable to and no less restrictive than the standards it uses to limit analogous medical and surgical benefits, regardless of how the standards happened to be developed and whether the development process was comparable. The Tenth Circuit's interpretation of the Parity Act directly reflects these principles. *See E.W.*, 86 F.4th at 1284 (holding that "[the Parity Act] prohibits limitations on benefits for mental health or substance-use disorder treatment that are 'more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan'") (quoting § 1185a(a)(3)(A)(ii)).

Of course, the Parity Act requires only that treatment limitations be comparable and does not require that they be identical. *See Robert B. v. Premera Blue Cross*, 701 F. Supp. 3d 1153, 1182 (D. Utah 2023) ("Comparability, not a mirror image, is required."). Thus, to the extent, that treatment limitations for mental health and analogous benefits "both stem from the [principle] that the need for treatment is governed by the severity of a patient's illness," the treatment limitations are sufficiently comparable if they both are appropriately tailored to medical needs, even if their precise requirements vary. *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-CV-38, 2021 WL 2532905, at *20 (D. Utah June 21, 2021). But Anthem engages in sleight of hand when it moves from this well-established principle that the Parity Act requires comparability, not identity

16

to its much more controversial contention that the Parity Act requires only comparable development processes. This position goes well beyond the "undeniable reality that every illness is inherently different and requires different treatment" and instead suggests that parity requirements cease to apply whenever treatment limitations were developed through similar means (or the plaintiff is unable to prove otherwise). *Id.* Taken to its logical extreme, it implies that Anthem could employ a standard of denying all requested mental health benefits while granting requested medical and surgical benefits based on medical necessity so long as it developed these standards through the same process of querying paid consultants or codifying existing discriminatory practices.

None of the legal authorities cited by Anthem support this atextual and implausible interpretation. In addition to 29 C.F.R. § 2590.712(c)(4)(i), which is inconsistent with Anthem's interpretation as discussed above, Anthem relies on the following example contained in the regulations:

> *Example 4.* (i) *Facts*. A plan generally covers medically appropriate treatments. For both medical/surgical benefits and mental health and substance use disorder benefits, evidentiary standards used in determining whether a treatment is medically appropriate (such as the number of visits or days of coverage) are based on recommendations made by panels of experts with appropriate training and experience in the fields of medicine involved. The evidentiary standards are applied in a manner that is based on clinically appropriate standards of care for a condition.
>
> (ii) Conclusion. In this *Example 4*, the plan complies with the rules of this paragraph (c)(4) because the processes for developing the evidentiary standards used to determine medical appropriateness and the application of these standards to mental health and substance use disorder benefits are comparable to and are applied no more stringently than for medical/surgical benefits. This is the result even if the application of the evidentiary standards does not result in similar numbers of visits, days of coverage, or other benefits utilized for mental health conditions or substance use disorders as it does for any particular medical/surgical condition.

17

29 C.F.R. § 2590.712(c)(4)(iii); Def.'s Summ. J. Mot. at 16–17. This certainly suggests that the process by which standards are developed, especially when they are adequately informed by experts and medical principles, is relevant to determining whether the two are comparable. But it comes far from establishing that Anthem has a safe harbor to impose otherwise drastic disparities that are not adequately grounded in medical necessity simply because they happened to be developed through similar processes.

If Congress or federal agencies had intended to create the safe harbor proposed by Anthem where the anti-disparity principle codified in the Parity Act ceases to apply in a broad range of cases, one would expect the safe harbor to be articulated clearly and prominently. Instead, Anthem points to nothing but "vague terms" and "ancillary provisions" in the regulations and implausibly suggests that federal agencies "hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). And if the example in the regulation lends some support to Anthem's position, Anthem does not explain why this court should "defer to [the] agency interpretation" of the Parity Act rather than "exercise [its] independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). The text of the Parity Act clearly prohibits Anthem from imposing more restrictive limitations on mental health benefits, regardless of the process by which the limitations were developed. *See* 29 U.S.C. § 1185a(a)(3)(A)(ii). And to the extent that a federal agency thinks otherwise, it has failed to exercise its "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Anthem also argues that its position has been adopted by other courts in this district, but this argument does not accurately reflect the caselaw.[12] *See* Def.'s Summ. J. Mot. at 17–18 (citing

_____

[12] To be sure, Anthem cites one opinion from the Western District of Washington that comes closer to adopting its proposed safe harbor. *See* Def.'s Summ. J. Mot. at 18 (citing *K.K. v. Premera Blue*

*James C.*, 2021 WL 2532905, at \*20, *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp.3d 1177, 1205 (D. Utah 2023), *Robert B.*, 701 F. Supp. 3d at 1185). As discussed above, both *James C. v. Anthem Blue Cross & Blue Shield* and *Robert B. v. Premera Blue Cross* affirmed only that comparability does not require identity; in no way did they suggest that comparability in development process creates a safe harbor. *See James C.*, 2021 WL 2532905, at \*20; *Robert B.*, 701 F. Supp. 3d at 1181–85. *L.D. v. UnitedHealthcare Insurance* did emphasize that "the guidelines . . . used for applying the medical necessity limitation to mental health treatment and medical/surgical treatment were developed using similar processes." 684 F. Supp. 3d at 1204. But instead of holding that this fact created a safe harbor, *L.D.* also relied on its finding that that the plaintiff had failed to show that the guidelines were "materially different" in their substance. *Id.* at 1204–06.

In short, the court concludes that the Parity Act means what it says and proceeds to consider whether the treatment limitations Anthem applies to mental health treatments through the MCG RTC Guideline are "no more restrictive" than the limitations it applies to medical and surgical analogs. 29 U.S.C. § 1185a(a)(3)(A)(ii). Development processes certainly may be relevant to the analysis, but they cannot relieve Anthem of its unequivocal obligation to use mental health treatment limitations that are comparable to and no more restrictive than the limitations it applies for analogous medical and surgical benefits.

2)      Unlawful Disparity

With Anthem's proposed safe harbor rejected, the court addresses whether B.M. has established that Anthem's use of the MCG RTC Guideline for residential treatment centers is more

---

*Cross*, No. C21-1611-JCC, 2023 WL 3948236, at \*5 (W.D. Wash. June 12, 2023), *aff'd,* No. 23-35480, 2025 WL 415721 (9th Cir. Feb. 6, 2025)). However, to the extent that it adopts Anthem's position, it relies entirely on Anthem's strained reading of the regulations and does not even address the statutory text. *See K.K.*, 2023 WL 3948236, at \*5.

restrictive than the restrictions it applies to analogous skilled nursing and inpatient rehabilitation facilities.

While B.M. alleges several distinct disparities, his core allegation is that Anthem limits mental health benefits based on *both* needs-based and symptom-based criteria, whereas the surgical and medical analogs are limited based only on needs-based criteria. *See* ECF No. 106 ("Pl.'s Summ. J. Opp'n") at 27–28; Pl.'s Summ. J. Reply at 11–13. The MCG RTC Guideline requires patients to not only satisfy a needs-based criteria—namely, show that "treatment is necessary, appropriate, and not feasible at [a] lower level of care"—but also display particular symptoms at particular severity levels before they qualify for admission to residential treatment centers. *See* Pl.'s Rs. 1 at 287. By contrast, the criteria that Anthem applies for admission to analogous skilled nursing and inpatient rehabilitation guidelines require only that patients have sufficient care needs, without placing any additional requirements on particular symptoms being present at particular severities. *Id.* at 219–20, 254–55. This difference alone appears to qualify as an impermissible disparity because "claimants seeking medical/surgical benefits . . . have one less hurdle to clear," which is "specifically what the Parity Act was enacted to prevent." *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1032–33 (D. Utah 2021), *aff'd in part, vacated in part, rev'd in part on other grounds,* 118 F.4th 1248 (10th Cir. 2024).

Notably, Anthem does not meaningfully deny that this difference is present, wherein Anthem imposes an additional layer of symptom-based requirements for mental health benefits but not for surgical and medical analogs. Anthem's primary response is that the needs-based criteria for skilled nursing facilities and inpatient rehabilitation guidelines will only be met if the patient's symptoms exceed some "minimum severity" threshold. Def.'s Summ. J. Mot. at 29. But there is a qualitative difference between requiring a patient's symptoms to be sufficiently severe

to justify treatment *as part* of a needs-based analysis and imposing granular symptom-based requirements *on top* of the needs-based analysis. In the medical and surgical context, symptoms are only relevant to the extent that they inform patient needs. But in the mental health context, a patient may be denied necessary medical care simply because they are unable to check off enough boxes listing detailed symptom requirements.

This disparity in how mental health benefits are restricted does not even appear to reflect a legitimate medical purpose. B.M.'s expert Kovnick opined that the MCG RTC Guideline requires patients to have symptoms that typically require more intense care in a manner that is inconsistent with generally accepted standards of care for admission to residential treatment centers—unlike the requirements for analogous medical and surgical benefits, which are both consistent with generally accepted standards of care and tailored to correspond to patient needs. Kovnick Report at 7; Pl.'s Rs. 3 at 2516–17. In response, Anthem emphasizes that the symptoms articulated in the MCG RTC Guideline can be appropriately treated at residential treatment centers in particular circumstances. *See* Def.'s Summ. J. Opp'n at 25–27. But this does not undermine Kovnick's opinion that these symptoms required by the MCG RTC Guideline *generally* require more intensive care and are medically inappropriate as categorical requirements for residential treatment centers. Even as Anthem cites its own experts at length, it fails to provide any non-discriminatory explanation as to why an additional layer of symptom-based requirements should be applied to mental health benefits but not for analogous medical and surgical benefits; and it does not refute Kovnick's assessment that the categorical symptom-based requirements imposed by the MCG RTC Guideline on top of needs-based requirements are medically inappropriate for residential treatment centers. *See id.* at 26–28.

Although Anthem identifies cases from this district that have rejected Parity Act claims based on a provider's use of the MCG RTC Guideline, none of these cases addressed B.M.'s core argument that the MCG RTC Guideline imposes additional symptom-based requirements for residential treatment centers that are lacking from the needs-based requirements for the medical and surgical analogs in a manner that is medically inappropriate. *See M.Z. v. Blue Cross Blue Shield of Illinois*, No. 1:20-CV-00184-RJS-CMR, 2023 WL 2634240, at *18–21 (D. Utah Mar. 24, 2023); *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp. 3d 1177, 1203–06 (D. Utah 2023). Thus, while the MCG RTC Guideline may be familiar to this district, B.M.'s contentions of disparate treatment are new. And Anthem fails to cite any authority suggesting that it has free rein to impose an additional layer of requirements on mental health benefits that goes beyond what is required for medical and surgical benefits, when doing so plainly violates the text and spirit of the Parity Act and is not justified by a legitimate medical rationale.

Therefore, the court concludes that Anthem's use of the MCG RTC Guideline with respect to B.M.'s benefit request violated the Parity Act.

B.      Availability of Equitable Remedies

Finally, the court must address Anthem's remaining contention that it is entitled to summary judgment because B.M. has failed to establish the availability of equitable remedies. Def.'s Summ. J. Mot. at 31–33.

On this issue, only Anthem currently moves for summary judgment, which means ordinary summary judgment standards apply. Anthem bears an initial burden of "demonstrate[ing] the absence of a genuine issue of material fact" with respect to the availability of equitable remedies. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If Anthem makes an adequate showing, the burden shifts to B.M. to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). In applying this standard, the court construes all facts in the light most favorable to B.M. and draws all reasonable inferences in his favor as the nonmoving party. *Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, LLC*, 28 F.4th 996, 1006–07 (10th Cir. 2022). At the same time, because the availability of equitable relief "functions as an element of [B.M.'s] ERISA claim," it "must be supported by at least some evidence [for B.M.'s claim] to withstand summary judgment." *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1223 (10th Cir. 2019); *Key Fin. Plan. Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 643 (10th Cir. 1987).

In his complaint, B.M. requests various forms of equitable relief in connection to the Parity Act violation, which Anthem divides into four categories: "(1) reformation of [the] MCG [RTC Guideline]; (2) injunctive relief; (3) equitable estoppel; and (4) disgorgement of funds, surcharge, and restitution to make [B.M.] whole." Def.'s Summ. J. Mot. at 31; ECF No. 2 ("Compl.") ¶ 74. Anthem raises arguments regarding all four categories, many of which are plausible and suggest that B.M. may not be entitled to the full range of his requested relief. But Anthem fails to meet its initial burden of establishing that disgorgement, surcharge, and restitution are unavailable.

At the outset, Anthem argues that the requested disgorgement, surcharge, and restitution are not available in equity because they seek to impose liability on Anthem "for a contractual obligation to pay money." Def.'s Summ. J. Mot. at 33 (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002)). However, "the fact that this [requested] relief takes the form of a money payment does not remove it from the category of traditionally equitable relief." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011). And it is well-established that disgorgement, surcharge, and restitution may be appropriate equitable remedies to redress an ERISA violation.

23

*See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250–51 (2000) (disgorgement); *Amara*, 563 U.S. at 441–42 (surcharge); *Teets*, 921 F.3d at 1224–25 (restitution).

Anthem's remaining argument is that these remedies amount to "an award of benefits," which are not available to B.M. under equity because "he forfeited his right to benefits by failing to timely bring his claim under 28 U.S.C. § 1132(a)(1)(B)." Def.'s Summ. J. Mot. at 33. But as B.M. acknowledges, he "does not simply seek an award of benefits" but instead seeks the "relief necessary to make him whole," which "is an amount likely lower than the billed charges." Pl.'s Summ. J. Opp'n at 33–34. Anthem fails to explain why a failure to promptly bring a benefits claim under § 1132(a)(1)(B) necessarily precludes B.M. from recovering other forms of relief.

In its reply memorandum, Anthem invokes the familiar maxim that "equity will not grant relief if the complaining party has, or by exercising proper diligence would have had, an adequate remedy at law, or by proceedings in the original action." *Wellington v. MTGLQ Invs., LP*, No. 23-2101, 2024 WL 1573948, at *3 (10th Cir. Apr. 11, 2024) (citation modified); ECF No. 111 ("Def.'s Summ. J. Reply") at 20. But Anthem fails to provide any argument that B.M. *in fact* would have had an adequate remedy at law if he had brought suit before the statute of limitations expired. And because "[e]quity eschews mechanical rules," the bare possibility of a benefits claim does not necessarily preclude equitable relief when the evidence is viewed in the light most favorable to B.M. *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946).

Apart from the apparent availability of disgorgement, surcharge, and restitution, there are other equitable remedies requested by B.M. that Anthem simply fails to address—such as a request for an accounting of funds wrongly withheld. *See* Compl. ¶ 74; *Heather E. v. California Physicians' Servs.*, No. 2:19-CV-415, 2020 WL 4365500, at *6 (D. Utah July 30, 2020) (holding that the "[p]laintiff may seek, pursuant to § 1132(a)(3), an accounting of moneys that were

wrongfully withheld from them"); Def.'s Summ. J. Mot. at 31–33; Def.'s Summ. J. Reply at 19–20.

Anthem has thus failed to meet its initial burden of establishing that it is entitled to judgment in its favor based on B.M.'s failure to prove the availability of equitable remedies. Accordingly, its request for summary judgment on these grounds is denied.

## CONCLUSION AND ORDER

For the reasons above, the court rules as follows: Anthem's motion to exclude expert opinions is GRANTED IN PART and DENIED IN PART; Anthem's motion for summary judgment is DENIED; and B.M.'s motion for partial summary judgment is GRANTED. The court ORDERS the parties to submit a proposed scheduling order, either jointly or separately, with respect to the determination of remedies by August 28, 2026.

DATED July 29, 2026

BY THE COURT

Jill N. Parrish
United States District Court Judge